UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CLIFTON FRENCH, et al.,

   Plaintiffs,

   v.                                    Case No. 3:21-CV-670 JD

STEVEN HOPE, et al.,

   Defendants.

### OPINION AND ORDER

Plaintiffs Clifton French and Real News Michiana are a journalist and a news organization covering events in the Northern District of Indiana. Mr. French wrote an article in Real News Michiana about a sixth-grade teacher, an employee of Defendant Goshen Community Schools ("GCS"), who was an organizer of a party for children involving a drag show. Three weeks later, Mr. French attended GCS's School Board meeting. Due to Covid-19 and expected large number of attendees, the meeting was held at a location different than usual and there was no podium for the speakers. When Mr. French asked Defendant Superintendent Steven Hope where he can place his recording devices, he was told "no mics!" Believing that Dr. Hope forbade Mr. French to record the meeting in retaliation of their coverage of the planned drag show by a GCS's employee, Plaintiffs sued in this Court, alleging a First Amendment violation. Defendants moved for summary judgment, which the Court will grant in their favor because Plaintiffs have not presented any evidence showing that Plaintiffs' protected conduct was at least a motivating factor of any adverse action.

   **A. Facts**

As required at the summary judgment juncture, the Court draws all reasonable inferences and construes all relevant facts in the light most favorable to the nonmovants, here, the Plaintiffs. These facts are as follows:

Plaintiff Real News Michiana ("RNM") is a media company covering news stories throughout the Northern District of Indiana. Plaintiff Clifton French has been a journalist for many years. Currently, Mr. Clifton operates and reports for Real News Michiana.

Defendant Goshen Community Schools ("GCS") is an Indiana public school corporation, serving students in Goshen. Its superintendent is Defendant Dr. Steven Hope. GCS operates under the direction and control of a seven-member Board of School Trustees. Under Indiana law, the School Board is the ultimate decision-maker for the Schools. The School Board holds periodic public meetings. According to the Board Policy 0167, members of the public and representatives of the press may record the meetings:

> Tape or video recordings are permitted. The person operating the recorder should contact the Superintendent prior to the Board meeting to review possible placement of the equipment, and agrees to abide by the following conditions:
>
> 1. No obstructions are created between the Board and the audience.
> 2. No interviews are conducted during the Board meeting.
> 3. No commentary is made that would distract either the Board or members of the audience.

(Board Policy 0167, DE 24-2 § F.)

On July 16, 2021, Mr. French published with Real News Michiana a story involving a sixth-grade teacher employed by GCS. According to the story, the teacher was organizing a "Party with Youth Drag Show" to be held at a public park in Goshen. The event was being promoted by the Goshen LGBTQ Pride organization. There's no indication in Plaintiffs' factual submissions that the article was critical of Defendants. Shortly after the story was published, the event was canceled. Mr. French sought comment from Dr. Hope as to whether he was aware that

2

one of the middle school teachers had organized a drag show for kids but Dr. Hope did not respond to Mr. French's request. However, Mr. French was informed by a concerned citizen that Dr. Hope denied that the story was true.

About three weeks after Mr. French published the story, on August 9, 2021, the first day of school, the School Board held a public meeting. The meeting was moved from its usual location at the administration center to the Goshen Intermediate School due to Covid-19 concerns and the number of expected attendees. Goshen Intermediate School provided a larger venue, but the normal accouterments of regular board meetings weren't available, including a podium for public speakers. Numerous people in attendance planned to speak both for and against the teacher's involvement with the youth drag show.

Mr. French intended to provide continuing journalistic coverage of this issue. He came to the meeting early so he could set up a recording device in accordance with the School Board policy. Having a recording device at the meetings was intended to help him to accurately cover the meeting and accurately quote any public statements. In the past, Mr. French and others were allowed to place the recording devices on the podium. Mr. French approached Dr. Hope and asked him where he could set up his audio and video recording devices—given there was no podium for this meeting—to which Dr. Hope emphatically responded with "No mics!" Dr. Hope provided no explanation for his prohibition. Aside from a staff member, Mr. French was the only person speaking with Dr. Hope at the time and the comment was directed at him only. It doesn't appear any other members of the media were present for the meeting. Mr. French perceived Dr. Hope to be openly hostile to him because of the story he had written earlier. In addition, Mr. French interpreted Dr. Hope's statement to mean that he was not allowed to record the hearing at

3

all.[1] Other staffers informed Mr. French that the video recording of the hearing would be posted on YouTube. Mr. French complied and did not place his recording devices.

At the beginning of the meeting, Dr. Hope made a statement in support of LGBTQ rights. Mr. French, who remained in attendance, was not able to get his exact statement without the help of the recording devices. During the public comment part of the hearing, which lasted for the majority of the meeting, numerous people spoke on issues of the youth drag program, critical race theory, vaccines, masking, student transportation, and social and emotional learning. Mr. French secretly video recorded a portion of the hearing, but was unable to record the sounds. Mr. French also placed a microphone on one of the public speakers to record that person's address to the board. However, believing that he was unable to openly record the meeting, Mr. French left early hoping to watch the recording online.

That evening, Mr. French attempted to watch the video recording on YouTube. However, the recording wasn't placed on the School's website until the next day, August 10.[2] Plaintiffs state that the video recording contained edits of some parts of the meeting. For example, Dr. Hope's pro-LGBTQ statement was removed; also, the crowd reactions to speakers' statements

---

[1] According to Dr. Hope, "when approached by Mr. French and others before the meeting, [he] told them there would be 'no mics' *at the front*. This statement was applicable to all individuals who attended the meeting, and none were permitted to place recording devices *at the front*." (Hope. Aff., DE 24-2 ¶ 6 (emphasis added).) In his responses to the Request for an Answer, Mr. French said that "[i]t may be possible [Dr. Hope] told other people [the 'no mic' directive] but [he] would have no way of knowing that." (DE 24-1 at 6.)

[2] In his affidavit, Mr. French says that he attempted to review the video that night but "the video was taken down for some reason." (French Aff., DE 39-1 ¶ 22.) He further states that he published a story noting that the video of the public meeting was taken down off the school's YouTube site, after which the video was back up. Yet, Mr. French provides no evidence that the video, apart from streaming live during the hearing, was actually uploaded on the website on August 9; his affidavit does not say so nor does he provide any evidence in support of that statement. To the contrary, his statement implies that the video of the meeting was unavailable the first time he attempted to view it, and the Court is not bound by his unsupported conclusion that "the video was taken down for some reason." Therefore, on the basis of what has been submitted to the Court, it cannot be said that the video of the meeting was first uploaded in its original form, then taken down, edited, and uploaded again. (*See* Hope Aff., DE 24-2 ¶ 5 ("The August 9, 2021, public meeting of the Goshen School Board was livestreamed to the public on the School's website, and an audio/visual recording of the meeting was placed on the School's website the next day, August 10, 2021.)

4

were inaudible. Mr. French claims that, due to the edits, he was unable to fully cover the meeting.

On September 9, 2021, Mr. French sued Goshen Community Schools and Dr. Hope, bringing a three-count complaint. In Count 1, Mr. French claims that the GCS violated the Indiana Open Door Law, Ind. Code § 5-14-1.5-1 *et seq.* In Counts 2 and 3, Mr. French claims that Dr. Hope and GCS violated his First Amendment rights, seeking declaratory and injunctive relief as well as compensatory and punitive damages. Defendants moved for summary judgment as to all counts.

**B. Legal Standard**

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "But our favor toward the nonmoving party does not relieve it of the obligation to do more than simply show that there is some metaphysical doubt as to the material facts." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quotation marks omitted). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*,

621 F.3d 651, 654 (7th Cir. 2010). There must be more than a mere scintilla of evidence in support of the opposing party's position and "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009); *Anderson*, 477 U.S. at 252. Instead, the opposing party must have "evidence on which the jury could reasonably find" in his or her favor. *Anderson*, 477 U.S. at 252.

**C. Discussion**

In response to Defendants' motion for summary judgment, Plaintiffs concede that their claim under the Indiana Open Door Law in Count 1 is time-barred and agree that summary judgment should be entered in favor of the GCS on this claim. (Pls.' Resp. Br., DE 38 at 6.) They also concede that the claim in Count 2 for violation of the First Amendment against Dr. Hope in his official capacity is duplicative to the same claim against the Goshen Community Schools. (*Id.* at 9.) Finally, they agree that, under Count 3, they have no claim against GCS under the respondeat superior theory. (*Id.* at 10.) Accordingly, only the claims against Dr. Hope (Count 2) and GCS (Count 3) for violations of the First Amendment remain. (DE 1 ¶¶ 57-58.)

Plaintiffs submit that Dr. Hope denied Mr. French and RNM the opportunity to record the August 9 meeting in retaliation for reporting about the planned drag party by one of the GCS teachers; in addition, they suggest, but present no argument, that they were targeted for their conservative views in general. Mr. French claims that there's a genuine issue of material fact as to whether Dr. Hope prohibited him from recording the meeting in retaliation for writing an article unfavorable to the Goshen Community Schools. Defendants, on the other hand, maintain that Plaintiffs have failed to present any evidence of retaliation, so summary judgment is appropriate on their First Amendment claims. In addition, Dr. Hope claims that he's entitled to

qualified immunity, and GCS argues that it bears no liability even if Dr. Hope were to be found liable.

"Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 450 (1938). "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory action . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). This prohibition is based on a concept that public officials may not police which types of expression will be permitted and which will not. *See Cox v. State of La.*, 379 U.S. 536, 557 (1965) ("It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."). "The principle that has emerged from our cases 'is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). "We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal v. Tam*, 582 U.S. 218, 244 (2017) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)).

The parties are in agreement as to Plaintiffs' burden in making out a prima facie case of retaliation. (Pls.' Resp. Br., DE 38 at 6 ("To prevail on a claim for First Amendment retaliation,

a plaintiff must establish three elements (citing *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020); Defs.' Rep. Br., DE 42 at 3 ("Mr. French correctly lists the three factors he must meet to prove his First Amendment retaliation claims.").) Namely, Plaintiffs "[f]irst [] must show [they] engaged in protected First Amendment activity. Second, [they] must show an adverse action was taken against [them]. Third, [they] must show [their] protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020); *see also Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). However, Plaintiffs have established only the first element of their *prima facie* case.

Plaintiffs have shown that they engaged in protected First Amendment Activity. Although Defendants implicitly propose that Mr. French is not a real journalist—they describe him somewhat derisively as "a self-styled journalist" (DE 25 at 2)—there's no dispute that he and RNM engaged in protected First Amendment activities. Mr. French and RNM are in the business of reporting news throughout the Northern District of Indiana to conservative audiences and Mr. French attended the public School Board meeting on July 9, 2021, for the purpose of reporting on the meeting. Yet, this is where Plaintiffs' retaliation claim comes to a halt.

Plaintiffs have not shown that an adverse action was taken against them. While they claim that Dr. Hope's "no mics!" statement to Mr. French was an outright prohibition from recording the event, that is not a reasonable inference under the facts of this case. As he usually would do, Mr. French arrived to the meeting early so he could set up his recorders. Dr. Hope states in his affidavit, he told Mr. French "no mics!" because there was no podium or table for the speakers at the new location where the recorders could be placed. While Dr. Hope did not explain his reasoning at the time, it's unreasonable to infer that Dr. Hope outright forbade Mr. French to record the meeting. Instead, the statement must be considered in context. Mr. French

8

sought to place the recorders where the public speakers would be addressing the School Board but there was neither a podium nor a table available. Under these circumstances, and without more, "no mics" does not mean that all recording from any position was prohibited. Under the second element, Mr. French must show that the "retaliatory activities would 'deter a person of ordinary firmness' from exercising First Amendment activity in the future." *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009) (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982). So the question is not whether Dr. Hope's statement deterred Mr. French from recording the event but whether a reasonable person would be deterred. And here, although Mr. French may have misunderstood Dr. Hope, a person of ordinary firmness would not have believed that he was prohibited altogether from recording the meeting.

Granted, having the recorders at the front may have been ideal for Mr. French, but Plaintiffs have not shown that Dr. Hope placed an unreasonable time, place, and manner restriction on recording the meeting. Instead of arguing that limiting the placement of the recording devices was not narrowly tailored to promote a significant government interest, *cf. Sandefur v. Vill. of Hanover Park*, 862 F. Supp. 2d 840, 847 (N.D. Ill. 2012) ("It is well-settled that a local government has a significant interest in maintaining order at its meetings.") (collecting cases), Plaintiffs have staked their case on the assumption that the restriction on the recording devices was a ban, not a placement limitation. Yet, as explained above, such an assumption is unreasonable. Mr. French was not denied the opportunity to record the board meeting; he was denied the opportunity to record from the vantage point he would have preferred.

Moreover, Plaintiffs have not shown that Dr. Hope placed the restriction on Mr. French only. Instead, Dr. Hope's averment in his affidavit that he also told others that there would be no

9

mics at the front stands uncontradicted. Although, at the time Dr. Hope spoke to Mr. French he was the only person inquiring about the placement of the recording devices, he has not submitted any evidence to cast doubt on Dr. Hope's sworn statement. Instead, he recognizes that "[i]t may be possible [Dr. Hope] told other people [the no mic directive] but I would have no way of knowing that." (RFA 19, DE 24-1 at 6.) Therefore, Mr. French's argument that he was singled out for retaliatory treatment is not supported by any evidence.

But even if the "no mics!" directive could somehow be construed to mean that Dr. Hope singled out Mr. French and forbade him to record the School Board meeting, Plaintiffs would still be unable to prevail against Defendants' motion for summary judgment because they have not provided any evidence that Plaintiffs' protected conduct—the publication of the article about the youth drag party—was at least a motivating factor of the adverse action. Plaintiffs merely invite the Court to accept their speculation about Dr. Hope's motives, "[b]ut, '[i]t is well-settled that speculation may not be used to manufacture a genuine issue of fact.'" *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)); *see also Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment . . . . Speculation will not suffice." (internal citations and quotation marks omitted)).

Plaintiffs' only evidence concerning the retaliation against them is that Mr. French wrote an article on July 16, 2021, about a sixth-grade teacher organizing a party with a youth drag show; requested a comment from Dr. Hope about the article but received none, even though Dr. Hope responded to an inquiry from a member of the public and claimed the story wasn't true; twenty-four days after the article was published, Dr. Hope told Mr. French "no mics!" when

asked about the placement of the recording devices; and before the meeting started, Dr. Hope expressed support for the LGBTQ students. No reasonable jury could find from these facts that Dr. Hope's motivation behind disallowing the recording devices was to retaliate against the Plaintiffs for publishing the article about one of his teachers.

*Springer v. Durflinger*, 518 F.3d 479 (7th Cir. 2008), is illustrative of why Plaintiffs cannot prevail against Defendants' motion for summary judgment. In *Springer*, the parents of two students sued the school district and its various employees claiming that they were retaliated against in violation of the First Amendment for having complained about their softball coach. *Id*. at 480. The parents believed that the coach had been suppressing the skills and abilities of their daughters to showcase the coach's younger sister. They hired an attorney and called for a meeting with various school officials. After the meeting, the school found no evidence warranting discipline against the coach and assured the parents that their daughters will not be subject to unfair treatment. *Id*. at 481.

But the parents weren't convinced, believing that "the school undertook specific actions in retaliation against them after they raised their concerns, effectively punishing them for speaking against [the coach]." *Id*. They cited to the court as evidence of retaliation "the school board's failure to respond to two [unanswered] written requests they made to meet with the board about the softball situation" *Id*. "On one occasion, the parents started a conversation with a school teacher, who cut the encounter short by saying school administrators instructed him not to have contact with the parents." *Id*. Other parents began disassociating from them and they weren't asked to serve as ticket takers or parent boosters during the season. *Id*. "At the start of the softball season, the school implemented a new policy—applicable to the public in general— that prohibited videotaping from behind the backstop at the catcher's position. [One of the

parents] had previously taped games from that vantage point." *Id*. The parents felt the coach was to blame for one of the daughters getting accidentally hit in the head by a softball. *Id*. at 482. At the end of the season, other players wrongly informed the daughters about the start time of the awards ceremony. *Id*. And finally, the coach told a university softball coach that one of the daughters was a great kid but the coach should keep good records, suggesting that her parents were "a little bit overbearing." *Id.*

None of this convinced the Court of Appeals for the Seventh Circuit that there was a genuine dispute as to whether the school and other defendants retaliated against the parents. Instead, the court found that the parties' dispute centered on the parents' speculation:

> There is a dispute here in the generic sense—the parties adamantly dispute the explanations for the various events that occurred after [the meeting]. The parents argue that the events were fueled by the school's retaliatory motives. The school officials, on the other hand, say they made policy decisions based on factors wholly distinct from [the parents'] complaints. This disagreement centers on the parents' speculation about the school's retaliatory motives. But, "[i]t is well-settled that speculation may not be used to manufacture a genuine issue of fact." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001); *see also Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment . . . . Speculation will not suffice." (internal citations and quotation marks omitted)).
> The parents' argument in opposition to summary judgment boils down to an allegation that defense witnesses are lying and the stated reasons for the school's actions are phony. They argue that there are "two sides to every story, which makes this a perfect credibility case for a jury to decide." The parents correctly note that evaluations of witness credibility are inappropriate at the summary judgment stage. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). However, when challenges to witness' credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper. *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ( "[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment.").

*Id*. at 484.

So it is with the case before the Court. First, Plaintiffs would like the Court to infer that proximity of the meeting to when Mr. French published the article establishes that Dr. Hope had

12

a prohibited motive in dealing with Mr. French. However, while in the Seventh Circuit there's no absolute prohibition against establishing a trial issue through suspicious timing alone, "[w]hen a plaintiff relies solely on a suspicious timing argument, however, the time period between the protected activity and the adverse action must be very close—typically a period of days, not weeks or months." *Kingman v. Frederickson*, 40 F.4th 597, 603 (7th Cir. 2022) (quotation marks omitted) (case decided in an employment discrimination context); *see also Springer*, 518 F.3d at 485 ("[A]s we have stated on many occasions, 'timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim.'") (citing cases); *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758–59 (7th Cir. 2006) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff also must put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination and termination.") (brackets and quotation marks omitted); *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012) ("The mere fact that Jeffersonville terminated Povey three weeks after a complaint, by itself, is not sufficient to create a genuine issue of material fact to support a retaliation claim.") (employment discrimination context). More is needed, that is, that the suspicious timing must be corroborated by other evidence.

But Plaintiffs have not presented any such evidence, even if they tried. In his affidavit, Mr. French states that, after writing the article, he "sought comment from . . . Dr. Hope as to whether he was aware that one of his public school teachers was involved in organizing a drag show for kids." However, "Dr. Hope refused to respond to [his] request for a comment." (DE 39-1 ¶ 11.) Yet, Dr. Hope responded to a concerned citizen denying that the story was true. But Dr. Hope ignoring Mr. French's request for comment while responding to a concerned citizen in no way establishes that Dr. Hope retaliated against Plaintiffs at the August 9 meeting. In fact, apart

from reciting these facts, Plaintiffs do not explain how they give rise to an inference that Mr. French's article was a motivating factor for Dr. Hope when he disallowed the recording devices. While the court of public opinion—rightly or wrongly—may be based on nods, winks, and presumption of what somebody's views or intentions are, the court of law requires corroborating evidence, and there's none here. *See Springer*, 518 F.3d at 484 ("Here, all the plaintiffs have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment.") (citing *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and '[d]iscrimination law would be unmanageable if disgruntled employees ... could defeat summary judgment by affidavits speculating about the defendant's motives.' " (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991))). Furthermore, Plaintiffs submit that Dr. Hope didn't explain to Mr. French why he was prohibiting the recording but they provide no authority suggesting that Dr. Hope was obliged to provide such an explanation. Next, on the basis of Mr. French's affidavit, Plaintiffs "believe that Dr. Hope was explicitly targeting [him] and [him] alone in an attempt to punish [him] for simply writing a story about an issue that is important to people for various reasons." However, "a plaintiff's subjective beliefs 'are insufficient to create a genuine issue of material fact.'" *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 794 (7th Cir. 2015). Again, without more, such as a showing of an admission or pretext, or anything from which the Court could reasonably infer a prohibited animus, the Court is presented only with Plaintiffs' speculation as to why Dr. Hope did what he did. Finally, Plaintiffs suggest that a prohibited reason was motivating Dr. Hope in his dealings with Mr. French because "[s]hortly after denying [him] an opportunity to record the audio, [Dr.] Hope made a public statement to the room that appeared to pick a side . . .

expressing support for the LGBTQ community." If differing political views were the sole basis for establishing retaliation, then every adverse action involving persons of different political affiliations would end up in trial. Yet, that's a far cry from reality. *See, e.g.*, *Kasak v. Vill. of Bedford Park*, 563 F. Supp. 2d 864, 877 (N.D. Ill. 2008) ("It is not enough for the plaintiff to show only that he was of a different political persuasion than the decision makers. Plaintiff must present specific evidence that the decision makers knew of his political affiliation, and took action against him because of it.") (citation omitted). As in *Springer*, where "[t]he parents [had] no personal knowledge of the defendants' motives for each act, nor [could] they point to documents, statements, or other proofs of retaliation[,]" so here all that exists is the speculative nature of Plaintiffs' theory: "I believe that Dr. Hope was explicitly targeting me and me alone in an attempt to punish me for simply writing a story about an issue that is important for people for various reasons;" "[h]is statement in support of LGBTQ rights only further implied that he had already picked a clear side on this issue from a political standpoint, and did not like the attention that the story was getting;" ". . . it simply is not right for him to punish a journalist because he does not agree with what he views to be a story that does not fit his political views;" "[t]he entire atmosphere from Dr. Hope appeared to be openly hostile to me simply because I was the person that covered the story." (French Aff.*,* DE 39-1 ¶¶ 16–17.) *Cf. Springer*, 518 F.3d at 484–85 ("[M]y common sense tells me it was"; "I felt that was obvious . . . no one told me that."; "They don't have to tell me. They did it."; . . . "I believe their actions were, yes, retaliations against us after that meeting."; "It was what they did, not what they told."; "Actions speak louder than words."; "they didn't call it anything ... they just did it."; "I didn't have to ask. I knew why."). Without evidence that Plaintiffs' report about the sixth-grade teacher planning an adult-themed party was at least a motivating factor to Dr. Hope's action against them, they cannot prevail

against Dr. Hope. Accordingly, the Court does not need to separately consider Dr. Hope's qualified immunity defense.

Moreover, because Plaintiffs have not shown that Dr. Hope violated their First Amendment rights, they cannot prevail against GCS either. "Where a plaintiff brings a *Monell* claim against a municipality based on the specific conduct of a municipality employee, the plaintiff cannot prevail on that *Monell* claim without first showing that the employee violated the plaintiff's constitutional rights." *Carr v. City of N. Chicago*, 908 F. Supp. 2d 926, 929 (N.D. Ill. 2012). Of course, in some cases "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." *Thomas v. Cook Cnty. Sheriff's Dep't.*, 604 F.3d 293, 305 (7th Cir. 2010). But such is not the case here.

Plaintiffs argue that GCS's liability arises out of the fact that "Dr. Hope was the policy-maker tasked with media communications and issues involving recordings." (Pls.' Resp. Br., DE 38 at 10); *Cf. Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority."). Consequently, if Dr. Hope didn't violate Plaintiff's First Amendment rights, neither did GCS.[3] In other words, this is not the case where a municipal employee has no requisite intent to commit a constitutional violation but the policies or governmental practices or customs are themselves unconstitutional. Rather, a finding against GCS but not Dr. Hope would create an inconsistent verdict because, according to

---

[3] The parties are in agreement that the only possible basis for GCS's liability is the fact that Dr. Hope is an official with final policy-making authority.

Plaintiffs, GCS is liable only because Dr. Hope is an official with final policy-making authority. Accordingly, Plaintiffs cannot prevail against GCS on their First Amendment claim without first prevailing against Dr. Hope.

**D. Conclusion**

For these reasons, the Court GRANTS Defendants' motion for summary judgment (DE 24) as to all of Plaintiffs' claims. The Clerk is ordered to CLOSE this case.

SO ORDERED.

ENTERED: March 22, 2023

                                              /s/ JON E. DEGUILIO
                                              Chief Judge
                                              United States District Court